**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **R.F., a minor, by and through Caren Holderman, Educational Rights Holder, and Janet Ahern, Guardianship Administrator for the Illinois Department of Children and Family Services, as next friends of R.F.** | ) ) ) ) ) ) ) ) | |
| **Plaintiff,** | ) ) | **No. 1:22-cv-02608** |
| **v.** | ) ) ) | **JURY TRIAL DEMANDED** |
| **Board of Education of the City of Chicago, a/k/a Chicago Public Schools, District 299, and Pedro Martinez, in his Official Capacity as Chief Executive Officer and Superintendent of Chicago Public Schools,** | ) ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## COMPLAINT

## INTRODUCTORY STATEMENT

1.     R.F.[1] is a ten-year-old child who is enrolled at Wilma Rudolph

Learning Center, a therapeutic day school within Chicago Public Schools District

#299 ("CPS"). R.F. is a youth in care with the Illinois Department of Children and

---

[1]Pursuant to Federal Rule of Civil Procedure 5.2, R.F.'s initials are provided in lieu of her full name, as she is a minor. *See* Fed. R. Civ. Pro. 5.2(a)(3); *S.F. v. Archer Daniels Midland Co.*, 594 Fed. Appx. 11, 12 (2d Cir. 2014) (under Rule 5.2(a)(3), "only a minor's initials should be used in publicly filed documents").

Family Services ("DCFS"), under the guardianship of Guardianship Administrator Janet Ahern. R.F. is a medically complex, quadriplegic student with diagnoses that include Spastic Quadriplegic Cerebral Palsy, Ulcerative Colitis, and Profound Intellectual Disability.

2.      When R.F. was seven years old, Defendants identified her as a child with a disability under the Individuals with Disabilities Education Act ("IDEA").

3.      R.F.'s Individualized Education Program ("IEP")[2.] requires that R.F. be provided with transportation to and from school in order for R.F. to receive a Free Appropriate Public Education ("FAPE") under the IDEA. Due to R.F.'s disability and per her IEP, R.F.'s transportation services are required to include an air-conditioned bus, a wheelchair lift, an aide, and a shared nurse on the bus. R.F.'s IEP (redacted to protect her identity) is attached hereto as Exhibit A.

4.      The IDEA therefore mandates that Defendants provide R.F. with transportation, including an air-conditioned bus, wheelchair lift, an aide, and a nurse, to and from school, and R.F. is unable to attend school regularly without transportation services.

5.      However, Defendants have failed to provide the required transportation from March 17, 2022, through the date of filing this Complaint.

---

[2]An IEP is the plan and legal document that lays out the special education instruction, supports and services that a student with a disability needs in order to receive a free appropriate public education, as required by the IDEA.

6.     Therefore, R.F., through Caren Holderman and Janet Ahern, as next friends on behalf of R.F., asks the Court to enjoin Defendants to provide R.F. with transportation to and from school, under IDEA and under 42 U.S.C. § 1983 for deprivation of rights secured by IDEA, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* ("Section 504"), and the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.* ("ADA"), and asks this Court to order any available damages under 42 U.S.C. § 1983, Section 504, and the ADA.

## JURISDICTION

7.     The Court has jurisdiction over R.F.'s claims pursuant to 28 U.S.C. § 1331 (conferring jurisdiction over civil actions arising under laws of the United States); 28 U.S.C. § 1343(a)(3) (conferring jurisdiction over civil actions to redress the deprivation, under color of any state law, of any right secured by any Act of Congress providing for equal rights of citizens); the IDEA, 20 U.S.C. §§ 1415(i)(2), 1415(i)(3)(A), 1415(l); Section 504, 29 U.S.C. § 701 *et seq.*; the ADA, 42 U.S.C. § 12131, *et seq.,* and 42 U.S.C. §§ 1983-1988.

8.     The Court is the appropriate venue under 28 U.S.C. § 1391(b), in that the Defendants are subject to personal jurisdiction in the District, and the events giving rise to the Complaint occurred in the District.

3

## PARTIES

9.     R.F. is a "youth in care" (a status formerly referred to as a "ward of the state") in the guardianship of Janet Ahern, the Guardianship Administrator of DCFS. Janet Ahern is the student's legal guardian.

10.     R.F. resides in Chicago, in the Northern District of Illinois, in an assisted living facility.

11.      Caren Holderman is R.F.'s educational rights holder. The Illinois State Board of Education appointed Ms. Holderman as the student's educational surrogate parent, which makes Ms. Holderman the educational rights holder for purposes of IDEA and the "parent" within the meaning of the IDEA. *See* 34 C.F.R. § 300.30.

12.     Defendant Chicago Board of Education, also known as Chicago Public Schools ("CPS"), is constituted within Illinois for administrative control and direction of public elementary schools in the City of Chicago, which is located in the Northern District of Illinois. CPS constitutes a "local educational agency" within the meaning of the IDEA.

13.     Defendant Pedro Martinez, Chief Executive Officer and Superintendent of CPS, is sued in his official capacity.

14.     The Defendants receive federal funds from the United States Department of Education pursuant to the IDEA for the purpose of educating children with disabilities, and are responsible, *inter alia*, for ensuring that R.F.

receives a FAPE under the law. *See* 20 U.S.C. § 1401(9)(d). Since the Defendants receive federal funds, they are prohibited from discriminating against students with disabilities under § 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 34 C.F.R. § 104.4.

## STATEMENT OF THE CASE

### A.    REGULATORY AND STATUTORY BACKGROUND

### Individuals with Disabilities Education Act ("IDEA")

15.    The IDEA requires school districts receiving federal funding to provide a FAPE to eligible children identified as having disabilities. *See* 20 U.S.C. § 1400 *et seq.* The IDEA mandates that appropriate special education and related services be available for those children. *Id.*

16.    Every child who receives special education is entitled to a FAPE, which is defined, in part, as education provided in conformity with the child's IEP. 20 U.S.C. § 1401(9)(d).

17.    The IEP is a legally binding document that sets forth all the special education and related services that the school will provide to the student, and establishes the annual educational goals for the student. 34 C.F.R. § 300.320(a)(4).

18.    The IEP must also include the student's educational placement, which is the educational environment within which the special education instruction and services are provided.

5

19.     Per the IDEA, a child with a disability must be educated in a placement with their non-disabled peers to the fullest extent possible in order to ensure that the disabled child is receiving FAPE. *See* 20 U.S.C. § 1412(a)(5)(A).

20.     One of the placement options under the IDEA includes placement by the local education agency in a therapeutic day school, which is a specialized school program serving only students with disabilities with special education teachers and support in all classes and activities.

21.     Regardless of the student's IEP placement, the local education agency remains responsible for ensuring that students within its district receive an education in conformity with their IEP.

22.     Transportation is considered a "related service" within a student's IEP. *See* 20 U.S.C. §§ 1401(26)(A), 1414(d); 34 C.F.R. § 300.34. Transportation, including any services or supports the student would need on that transportation, such as air-conditioning, a lift, an aide, a harness, or a nurse, must be included in a student's IEP if they require transportation to and from their school program in order to receive FAPE.

23.     Under the IDEA, every student receiving special education services must have an annual review and revision of their IEP. *See* 20 U.S.C. §§ 1401(14), 1412(a)(4), 1414(a),(d).

24. The annual review and revision must occur no less than annually in order to determine what special education and related services are necessary for the student to receive FAPE. *See* 34 C.F.R. § 300.324; 20 U.S.C. §§ 1401(14), 1401(26).

25. The IEP team must contain at least one member with authority to bind the school district. *See* 23 Ill. Admin. Code § 226.210(d).

26. The IDEA provides a cause of action in federal district court, following exhaustion of the administrative remedies it provides. *See* 20 U.S.C. § 1415(l).

27. The requirement that administrative remedies under the IDEA be exhausted does not apply where any attempt to exhaust would be futile or inadequate. *See Honig v. Doe*, 484 U.S. 305, 326-27 (1988).

28. Actions to *enforce* an IEP do not require exhaustion of administrative remedies. Administrative hearing officers have no authority to enforce the requirements of an IEP, so attempting to enforce an IEP through administrative proceedings is futile. *See* 23 Ill. Admin. Code 226.660 (listing hearing officer's powers, which do not include enforcement powers); *Miksis v. Evanston Twp. High Sch. Dist. #202*, 235 F. Supp. 3d 960, 1006-1008 (N.D. Ill. 2017) (citing numerous cases holding that exhaustion of administrative remedies is not required when the issue is only a failure to implement the IEP, and not a challenge to the contents of the IEP); *Hollenbeck v. Bd. of Educ.*, 699 F. Supp. 658, 661 (N.D. Ill 1988) ("[I]ronically, there really is no administrative mechanism to enforce compliance with a hearing officer's order.").

7

29.     As explained in the IDEA's legislative history, "there are certain situations in which it is not appropriate to require the exhaustion of the [IDEA's] administrative remedies before filing a civil law suit. These include complaints that . . . an agency has failed to provide services specified in the child's individualized educational program." 131 Cong. Rec. § S10396-01 (1985) (remarks of Senator Simon). According to the applicable House Report, exhaustion is not required where "it would be futile to use the due process procedures (*e.g.*, an agency has failed to provide services specified in the child's individualized educational program . . .)." H.R. Rep. 99-296, at 7 (1985) (remarks of Representative Miller).

## Section 504 of the Rehabilitation Act ("Section 504")

30.     In addition to the protections of IDEA, students with disabilities in schools that receive federal funding are also protected from discrimination on the basis of their disability under § 504.

31.     Section 504 of the Rehabilitation Act requires that "[n]o otherwise qualified individual with a disability in the United States. . . shall, solely by reason of her or his disability, be excluded from participation, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

32.     Money damages are available under § 504 in cases of intentional discrimination. *See* 29 U.S.C. § 794a(a)(2).

33.     Intentional discrimination may be found where the defendant acts with deliberate indifference to the rights of the person with a disability, which may be established where the defendant has knowledge that a harm to a federally protected right is substantially likely and fails to act upon that likelihood. *See Audia v. Briar Place, Ltd.*, 2018 U.S. Dist. LEXIS 68950, at \*5 (N.D. Ill. 2018)

## **The Americans with Disabilities Act ("ADA")**

34.     The ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of Section 504 of the Rehabilitation Act to services provided by any public entity. *See* 42 U.S.C. § 12132 ("Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

35.     Under the ADA, public entities must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

9

36. The same "remedies, procedures and rights" set out under Section 504 apply to any person alleging discrimination on the basis of disability under the ADA. 42 U.S.C. §12133.

**B.    RELEVANT FACTS**

37. R.F. enrolled in CPS in 2018, when she was seven years old.

38. In 2018, R.F. first enrolled in Wilma Rudolph Learning Center, and Wilma Rudolph Learning Center is the only school that R.F. has attended since that time.

**R.F.'s IEPs**

***The 2017-2018 School Year***

39. R.F. is a medically complex, disabled child who enrolled in CPS in 2018. Due to her multiple disabilities, she was evaluated for special education services.

40. CPS's evaluations of R.F. indicated that R.F. has cognitive, social-emotional, speech, and motor deficits.

41.     On April 13, 2018, CPS determined that R.F. qualified for special education services under the IDEA. On the same date, it held a meeting with her IEP team, consisting of R.F.'s teachers, other educational professionals, and R.F.'s then foster parent, who determined what services R.F. required to receive FAPE, and included those within her IEP. One of these services included transportation to and from school with an air-conditioned bus, wheelchair lift, and devices to tie down her wheelchair.

42.     According to this IEP, while she was in school, R.F. was learning the names of her peers, and she benefited from activities that were auditory, visual, tactile, and kinesthetic, with many lessons presented throughout the school day. This IEP also reflects that R.F. loves being around her peers.

43.     CPS's IEP team revised R.F.'s IEP on April 27, 2018, in part by adding a shared nurse to the transportation section.

***The 2018-2019 School Year***

44.     On April 9, 2019, CPS held R.F.'s annual IEP meeting to review and revise her IEP to determine what special education services R.F. needed in order to receive FAPE.

45.     This IEP reflects that R.F.'s placement will remain at Wilma Rudolph Learning Center, and notes that she will have exposure with general education peers through school field trips and community events.

46.     The IEP also states that R.F. is interested in social interaction, such as being picked up, dancing with others who hold her hands, and listening and moving to music. She also participates in out-of-wheelchair activities including the wiggle room, sensory room, yoga class, PE class, recess, and gross motor movement breaks.

47.     At the meeting, based on the IEP team's review of R.F.'s disabilities and the other factors appropriately considered under the IDEA, the IEP team again included a requirement that the district provide R.F. with transportation to and from school, because transportation was necessary to allow R.F. to benefit from special education. *See* 20 U.S.C. § 1414(d); 34 C.F.R. 300.34. The transportation again included an air-conditioned bus, wheelchair lift, and shared nurse.

***The 2019-2020 School Year***

48.     On or around January 2020, Defendants were not providing a nurse on transportation for R.F., despite the requirement in her IEP. Due to R.F.'s medical complexity and out of fear for her safety, R.F.'s then foster parent transported R.F. to and from school at Wilma Rudolph Learning Center.

49.     Counsel for R.F. filed an educational compliance complaint with the Illinois State Board of Education, stating that the Defendants were failing to implement R.F.'s current IEP – specifically in regards to the provision of nursing services on the bus.

50.     On or around January 24, 2020, the Defendants temporarily assigned a nurse to R.F.'s bus route.

51.     On or around January 30, 2020, the Defendants permanently assigned a nurse to R.F.'s bus route in compliance with her IEP.

52.     Due to the COVID-19 pandemic and the Illinois stay-at-home executive order, all educational facilities were closed, removing all in-person academic instruction starting on March 17, 2020.

53.     On April 3, 2020, CPS held R.F.'s annual IEP meeting to review and revise her IEP to determine what special education services R.F. needed in order to receive FAPE.

54.     This IEP reflects that R.F. is an expressive eight year old who enjoys music class and bubbles, which make her smile.

55.     At the meeting, based on the IEP team's review of R.F.'s disabilities and the other factors appropriately considered under the IDEA, the IEP team again included a requirement that the district provide R.F. with transportation to and from school, because transportation was necessary to allow R.F. to benefit from special education. *See* 20 U.S.C. § 1414(d); 34 C.F.R. 300.34. The transportation included an air-conditioned bus, wheelchair lift, a shared nurse, and an aide. (Exhibit A, p. 31). This was R.F.'s most recent annual IEP to date, and remains in effect until a new one is created.

13

***The 2020-2021 School Year***

56.     In the context of the COVID-19 pandemic, due to R.F.'s multiple disabilities, inability to be vaccinated at the time, and inability to participate in virtual learning, R.F. was effectively excluded from any ability to attend school or participate in learning at CPS during the 2020-2021 school year.

***The 2021-2022 School Year***

57.     Due to circumstances beyond R.F.'s control, R.F. was not enrolled back into CPS until in or around January 2022.

58.     R.F., through counsel, contacted the Defendants on January 13, 2022, requesting that R.F. be placed back at Wilma Rudolph Learning Center, or if this option was not possible, a substantially similar school.

59.     On January 25, 2022, the Defendants stated that R.F. was still registered at Wilma Rudolph Learning Center and that transportation would be set up accordingly.

60.     On January 26, 2022, Special Education Case Manager at Wilma Rudolf Learning Center, Alex Cowling ("Case Manager Cowling") provided R.F.'s DCFS caseworker, Hanna Huff ("Caseworker Huff"), the medical and treatment forms required for enrollment at Wilma Rudolph Learning Center.

61.     On February 7, 2022, R.F., through counsel, reached out to the Defendants requesting that the Defendants start looking for transportation routes for R.F. while the appropriate forms were being completed.

14

62.    On February 24, 2022, the Defendants stated that they had submitted a request for transportation on February 15, 2022.

63.    On March 9, 2022, Case Manager Cowling stated via email that R.F. had been assigned a route and that a start date would be provided once DCFS completed the forms. Case Manager Cowling stated that he was working on getting pick up and drop off times for R.F.

64.    On March 17, 2022, DCFS provided all completed forms to CPS and Wilma Rudolph Learning Center. On this same date, Counsel for R.F. requested an update about R.F.'s transportation.

65.    Despite R.F.'s IEP requiring a shared nurse on transportation, as it has since April 2018, the Defendants did not submit a request for nursing services on the bus until March 17, 2022, delaying transportation and a start date.

66.    On every school day between March 18 and March 23, 2022, R.F. was unable to attend school because Defendants failed to provide R.F. with transportation to Wilma Rudolph Learning Center.

67.    R.F. resides in an assisted living center and does not have a traditional foster parent. Thus, she does not have a person who could transport her daily to and from school, even on a temporary basis.

68.     Ride-share companies such as Uber and Lyft not only require riders to be a minimum of 18 years of age, but these ride-share companies do not provide rides that include wheelchair lifts, an aide, or a nurse, making this option impossible.

69.     Due to R.F.'s disabilities and age, she cannot take public transit to school, which would take at least an hour with a minimum of two transfers. Additionally, not all public transit stops, particularly on the CTA train lines, are wheelchair accessible.

70.     On March 23, 2022, Case Manager Cowling stated that he was still waiting for a nurse to be assigned to R.F.'s bus per her IEP.

71.     Thus, on March 24 and 25, 2022, R.F. was still unable to attend school because Defendants failed to provide R.F. with transportation to Wilma Rudolph Learning Center.

72.     On Monday, March 28, 2022, CPS District Representative Maura McNulty ("District Representative McNulty") stated that the nursing administrators at CPS had concerns about R.F.'s transportation. Specifically, District Representative McNulty noted the projected length of time R.F. would be required to ride the bus if she was assigned to this proposed route, was two hours to school in the morning and two hours after school back home. This length was due to

16

this bus picking up and dropping off multiple other students along the route.[3] District Representative McNulty stated via email that this length of time, two hours each way, could create a risk of potentially life-threatening epileptic seizures, as well as other complications such as skin ulcerations. The Defendants determined that the route was not safe or viable for R.F.

73.     R.F., through counsel, and Ms. Holderman, R.F.'s educational rights holder, agreed that a route that would take two hours each way would be unsafe and therefore was not viable for R.F.

74.     Despite the agreement between the Parties that this route is not viable or safe for R.F., the Defendants have refused to provide an appropriate, shorter route for R.F. and have instead stated that she should be educated at her assisted living facility.

75.     Due to this refusal, on every school day from March 28 through March 31, 2022, R.F. was unable to attend school, as Defendants continued to fail to provide R.F. with transportation to Wilma Rudolph Learning Center.

76.     On April 1, 2022, District Representative McNulty emailed Counsel for R.F. stating that CPS cannot offer any other transportation route and that CPS wanted to establish "homebound services" for R.F.

---

[3] R.F. lives approximately 12 miles from Wilma Rudolph Learning Center. It would take approximately 30-45 minutes for R.F. to be transported directly from her assisted living facility to Wilma Rudolph Learning Center for school.

77.     Home and hospital instruction, also known as "homebound," is an academic program in which the student receives educational and related services in the home or hospital. It is intended for students whose disability makes it impossible for them to attend school with their peers, such as students who are currently hospitalized and unable to leave the hospital to attend school. Homebound is one of the most restrictive settings for a student and deprives them of all access to peers.

78.     A student's eligibility for home or hospital instruction is based upon a written statement from a physician that specifies the student's medical condition, the impact of the condition on the student's ability to participate in education, and the anticipated duration or nature of the student's absence from school. *See* 23 Ill. Adm. Code § 226.300(b). Homebound instruction should not be based on a district's refusal to provide appropriate special education services.

79.     Counsel for R.F., and R.F.'s educational rights holder, Ms. Holderman, agreed to have a meeting to discuss the ongoing transportation issues, but did not agree that it was lawful or appropriate for CPS to put R.F. in the most restrictive possible setting, depriving her of all access to and interaction with peers.

80.     On every school day from April 1 to April 11, 2022, R.F. was unable to attend school because Defendants continued to fail to provide R.F. with transportation to Wilma Rudolph Learning Center.

81.     On April 11, 2022, Counsel for R.F. contacted Counsel for the
Defendants, Senior Assistant General Counsel Marlene Fuentes ("Counsel
Fuentes"), stating that CPS was refusing to find a viable transportation route for
the student, per her IEP, and were instead pressuring her to accept an excessively
restrictive setting of homebound services.

82.     On April 11, 2022, Counsel Fuentes stated that a route had been
established, but noted that the length of travel time was a concern, and suggested
that R.F. look into other schools closer to her home. Counsel Fuentes, nor anyone
else at CPS, provided any other possible school options.

83.     CPS was on Spring Break from April 12, 2022, to April 17, 2022, so no
school was in session.

84.     On every school day between April 18 through April 27, 2022, R.F. was
unable to attend school because Defendants failed to provide R.F. with
transportation to Wilma Rudolph Learning Center.

85.     On April 28, 2022, a meeting was held with Case Manager Cowling,
District Representative McNulty, Counsel for R.F., R.F.'s educational rights holder
Ms. Holderman, and Caseworker Huff to discuss the issues with transportation.
Defendant offered only two choices: the two-hour transportation route that was
previously suggested and which the Defendants previously stated could seriously
endanger R.F.'s life and well-being; or homebound services in an inappropriately
restrictive environment without access to peers and with significantly fewer hours

of instruction. Counsel for R.F. reiterated that R.F. was not eligible for homebound, that it was not appropriate, and that CPS has a legal obligation to provide the services outlined in R.F.'s IEP. District Representative McNulty could not provide a timeline for when CPS would provide appropriate transportation, if ever.

86.     On every school day between April 28, 2022, through the filing of this Complaint, R.F. has been unable to attend school because Defendants failed to provide R.F. with transportation to Wilma Rudolph Learning Center.

87.     As a direct and proximate result of Defendants' conduct, R.F. has missed approximately 40 days of school since March 17, 2022.

88.     As a direct and proximate result of Defendants' conduct in failing and refusing to provide the appropriate transportation required by R.F.'s IEP, R.F. has suffered and continues to suffer irreparable harm, including but not limited to being denied her right to FAPE and her right not to be discriminated against in the provision of public educational services, on the basis of her disability.

**C.     Claims for Relief**

**COUNT I:   VIOLATION OF THE IDEA (20 U.S.C. § 1400 *et seq.*)**

89.     Paragraphs 1-88 above, and each of the paragraphs of Count II, are incorporated as if fully set forth herein.

90.     IDEA and its implementing regulations, 34 C.F.R. Part 300, require states and local school districts that receive funds under the IDEA to provide

school-age residents who have disabilities with a "free appropriate public education." *See* 20 U.S.C. § 1412(a)(1).

91.     R.F. is a child with a disability within the meaning of the IDEA who is entitled to special education and related services.

92.     Defendants failed and refused to comply with the IEP duly developed by her IEP team, by failing to provide transportation for R.F. to get to and from school, in accordance with her IEP.

93.     Transportation is a substantial and significant requirement in R.F.'s IEP, one upon which her ability to attend school depends.

94.     Defendants' willful failures to comply with R.F.'s IEP continues to result in R.F. being deprived of FAPE.

95.     R.F. has no administrative remedies to exhaust, as she seeks only enforcement of a duly-developed IEP.

96.     R.F.'s only dispute with Defendants is their willful refusal to comply with a clear requirement of that IEP, which does not require exhaustion. *See, e.g.,* H.R. Rep. 99 296, at 7 (1985).

97.     Defendants refused to comply with the IEP deliberately, without valid reason, in bad faith and gross misjudgment.

98.     Defendants willfully, intentionally, and with deliberate indifference refused to implement the appropriate related service set forth in R.F.'s IEP, specifically transportation service to and from school.

99.     Further, Defendants deprived R.F. of her rights in egregious fashion, knowing that their failure to provide transportation was likely to and would result in disruption and irreparable harm to R.F.'s education, causing her to miss school, and causing emotional distress to her.

100.    Defendants acted with at least deliberate indifference to the strong likelihood that a violation of R.F.'s federally-protected rights would result.

101.    Accordingly, the Defendants' actions and inaction constitute a violation of R.F.'s rights under the IDEA.

102.    As a result of Defendants' conduct, R.F. has suffered and continue to suffer irreparable harm and damages, including a violation of her rights under the IDEA.

103.    R.F. seeks an order requiring Defendants to comply with R.F.'s IEP, and an order requiring them to pay attorneys' fees incurred as a result of Plaintiff having to bring this action. *See* 34 C.F.R. 300.517(a).

## COUNT II:  DEPRIVATION OF FEDERAL RIGHTS SECURED BY THE IDEA IN VIOLATION OF § 1983

104.    Paragraphs 1-88 above are incorporated as if fully set forth herein.

105.    Under the IDEA, R.F. has a clear, enforceable federal right to FAPE. *See* 20 U.S.C. § 1412(a)(1).

106.    R.F. is the intended beneficiary of the IDEA, which confers upon her, among other things, the entitlement of FAPE.

107. FAPE is defined, in part, as education provided in conformity with a child's IEP. *See* 20 U.S.C. § 1401(9)(d).

108. R.F. is deprived of FAPE where the responsible parties fail and refuse, without justification, to provide a service unequivocally required by her IEP.

109. Transportation is a substantial and significant requirement in R.F.'s IEP, one upon which her ability to attend school depends.

110. Defendants have failed and refused to provide R.F. with a FAPE, in that they have failed and refused to comply with the requirement to provide her appropriate transportation as required by her IEP.

111. R.F. has no administrative remedies to exhaust, as she seeks only enforcement of a duly-developed IEP.

112. R.F.'s only dispute with Defendants is their willful refusal to comply with a clear requirement of that IEP, which does not require exhaustion. *See, e.g.,* H.R. Rep. 99 296, at 7 (1985);

113. Defendants acted under color of law in depriving R.F. of her federal rights.

114. Further, Defendants knew that their failure was likely to and would result in disruption and irreparable harm to R.F.'s education, causing her to miss school, and causing extreme emotional distress to her.

115. Defendants refused to comply with the IEP deliberately, without valid reason, in bad faith and gross misjudgment.

116.    Defendants acted with at least deliberate indifference to the strong likelihood that a violation of R.F.'s federally-protected rights would result.

**COUNT III:  VIOLATION OF § 504 (29 U.S.C. § 794(a) *et seq.*)**

117.    Paragraphs 1-88 above are incorporated as if fully set forth herein.

118.    Under § 504, students with disabilities who attend schools that receive federal funding are protected from discrimination on the basis of their disability, in those schools. *See* 29 U.S.C. § 794(a).

119.    Section 504 allows a person to seek remedies for violation of its mandates to a "person aggrieved" by violation of its provisions. 29 U.S.C. § 794a(2).

120.    Money damages are available under § 504 in cases of intentional discrimination. *See* 29 U.S.C. § 794a(a)(2).

121.    Intentional discrimination may be found where the defendant acts with deliberate indifference to the rights of the person with a disability, which may be established where the defendant has knowledge that a harm to a federally protected right is substantially likely and fails to act upon that likelihood.

122.    R.F.'s multiple disabilities and the impact they have on her functioning qualify her as a person with a disability under § 504.

123.    The Defendants violated R.F.'s rights and discriminated against her on the basis of disability by effectively refusing to provide her with transportation services required by her IEP, thus denying her access to education from March 17, 2022, through the date of this Complaint.

24

124.    The Defendants also showed deliberate indifference and bad faith in their refusal to find an appropriate transportation route for R.F. and by instead urging acceptance of an inappropriate placement. As is clear from communications, the Defendants made the determination that the proposed transportation route was not safe or appropriate for R.F. due to her disabilities.

125.    Despite this determination by the Defendants, the Defendants have refused to provide a safe and appropriate transportation route for R.F., showing deliberate indifference and bad faith towards R.F. and her apparent disability needs under § 504.

126.    Defendants acted with knowledge that a harm to R.F.'s federally protected right was not only substantially likely but substantially certain, and they continued to fail to act. This constituted at least deliberate indifference to the strong likelihood that a violation of R.F.'s federally protected rights would result.

127.    As a result of Defendants' conduct, R.F. has suffered and continues to suffer irreparable harm and damages, including a violation of her rights under Section 504.

**COUNT IV: VIOLATION OF THE ADA (42 U.S.C. § 12131, *et seq.*)**

128.    Paragraphs 1-88 above are incorporated as if fully set forth herein.

129.    The ADA prohibits discrimination against individuals with disabilities and extends the non-discrimination rule of Section 504 of the Rehabilitation Act to services provided by any public entity. See 42 U.S.C. § 12132.

130.    Under the ADA, public entities must make reasonable accommodations in their rules, policies, and practices when necessary to avoid discriminating against a person on the basis of a disability.

131.    Defendants are public entities subject to the requirements of the ADA.

132.    R.F. is a qualified individual with a disability within the meaning of the ADA.

133.    The same remedies available under Section 504 apply to discrimination claims under the ADA. 42 U.S.C. §12133. This includes damages for intentional discrimination.

134.    Intentional discrimination may be found where the defendant acts with deliberate indifference to the rights of the person with a disability, which may be established where the defendant has knowledge that a harm to a federally protected right is substantially likely and fails to act upon that likelihood.

135.    The Defendants discriminated against R.F. on the basis of disability in that they have failed to accommodate her disability by effectively refusing to provide her with the transportation services required in her IEP, thus denying her access to education from March 17, 2022, through the date of this Complaint.

136.    The Defendants also showed deliberate indifference and bad faith in their refusal to find an appropriate transportation route for R.F. and by instead

26

urging acceptance of an inappropriate placement. As is clear from communications, the Defendants made the determination that the proposed transportation route was not safe or appropriate for R.F. due to her disabilities.

137. Despite this determination by the Defendants, the Defendants have refused to provide a safe and appropriate transportation route for R.F., showing deliberate indifference and bad faith towards R.F. and her apparent disability needs under the ADA.

138. Defendants acted with knowledge that a harm to R.F.'s federally protected right was not only substantially likely but substantially certain, and they continued to fail to act. This constituted at least deliberate indifference to the strong likelihood that a violation of R.F.'s federally protected rights would result.

139. As a result of Defendants' conduct, R.F. has suffered and continues to suffer irreparable harm and damages, including a violation of her rights under the ADA.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff prays that the Court:

(a)    Enter a preliminary and permanent injunction against the Defendants, ordering them to comply immediately with R.F.'s IEP, including but not limited to providing her safe and viable transportation with an air-conditioned bus, a wheelchair lift, an aide, and a nurse, as outlined in her IEP, to and from school;

(b)    Award compensatory damages and fees under Section 504 and the

ADA;

(c)    Award attorneys' fees, as authorized under the IDEA, Section 504 and

the ADA; and

(d)    Grant such other relief as the Court deems just and proper.


DEMAND FOR A JURY TRIAL


Plaintiff demands a jury trial on all issues properly triable to a jury.


Dated: May 18, 2022

Respectfully submitted,

/s/ Jaclyn Ellwein
One of Plaintiff's Attorneys


Jaclyn Ellwein
Teresa Sullivan
Josephine (Jamie) Schulte
LEGAL AID CHICAGO
120 South LaSalle Street, Suite 900
Chicago, IL 60603
312.347.8360
jellwein@legalaidchicago.org

28