# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| R.F., a minor, by and through Caren Holderman, Educational Rights Holder, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 22-cv-2608 |
| v. | ) ) ) | Judge Joan B. Gottschall |
| Board of Education of the City of Chicago, a/k/a Chicago Public Schools District 299, et al., | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs have sued the Board of Education of the City of Chicago and the superintendent of Chicago Public Schools (collectively, "CPS" or "the district") in their capacities as the next friend and educational rights holder for R.F., a ten-year-old girl who the parties agree is "a medically complex, quadriplegic student with diagnoses that include Spastic Quadriplegic Cerebral Palsy, Ulcerative Colitis, and Profound Intellectual Disability." Compl. ¶¶ 2–3, ECF No. 1. At issue is R.F.'s transportation by CPS-provided bus from her home, an assistive living facility located on the north side of Chicago, to and from her day school located on Chicago's near west side. R.F.'s April 2020 Individualized Education Program ("IEP") requires CPS to provide her transportation to and from the school and her home address on an air-conditioned bus with a wheelchair lift, shared nurse, and an aide. IEP 31, ECF No. 10-2. In March 2022, CPS assigned R.F. a bus route, but CPS nursing staff raised concerns—concerns with which plaintiffs agree—about R.F.'s health and safety because R.F. would be required to travel two hours each way. *See* Pls.' Ex. E at 9–10, 11, ECF No. 10-6 (emails dated Mar. 28 and Apr. 1, 2022). CPS

has proposed providing home-based educational services for R.F.  Aff. of A. Cowling ¶ 28, ECF No. 12-1.

Plaintiffs brought this suit under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1401–82; 42 U.S.C. § 1983; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.; and the Rehabilitation Act, 29 U.S.C. § 701 et seq., and now seek a temporary restraining order to enforce the IEP's terms and compel CPS to provide R.F. transportation with an estimated travel time of no more than 60 minutes each way.  Proposed TRO 2.  The district opposes the motion on several grounds, principally that plaintiffs must first exhaust their state administrative remedies in accordance with the IDEA.  *See* 20 U.S.C. § 1415(l).  They also have submitted evidence that a shortage of bus drivers and nurses exists, due in part to the COVID-19 pandemic.

## I. Background

Neither side requested a hearing.[1]  The limited factual record therefore consists of exhibits submitted at the TRO stage.  Unless stated otherwise, the following facts are undisputed.

### A. The IDEA and Individualized Education Programs

The IDEA makes federal funds available to the states under certain conditions, including the condition that states commit to provide all eligible children a free appropriate public education, or FAPE for short.  *Joseph F. ex rel. Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (citing 20 U.S.C. § 1412(a)(1); other citations omitted).  A FAPE encompasses (1) "special education" and (2) "related services."  20 U.S.C. § 1401(9).  " 'Special education' is 'specially designed instruction . . . to meet the unique needs of a child with a

---

1   This court set a deadline and provided directions for counsel to request a TRO hearing.  *See* ECF No. 11.  The court received no hearing request.  Plaintiffs' prayer for relief includes a request to set a preliminary injunction hearing date.  *See* Reply 23, ECF No. 16.

disability' . . . ." *Endrew F.*, 137 S. Ct. at 994 (quoting § 1401(29)).  As defined in the IDEA,

related services include:

> transportation, and such developmental, corrective, and other supportive services
> . . . [including] school nurse services designed to enable a child with a disability to
> receive a free appropriate public education as described in the individualized
> education program of the child, . . . as may be required to assist a child with a
> disability to benefit from special education, and includes the early identification
> and assessment of disabling conditions in children.

§ 1401(26)(A).

The Supreme Court provided the following overview of the IEP process in *Endrew F.*:

> The IEP is "the centerpiece of the statute's education delivery system for disabled
> children."  *Honig v. Doe*, 484 U.S. 305, 311 (1988).  A comprehensive plan
> prepared by a child's "IEP Team" (which includes teachers, school officials, and the
> child's parents), an IEP must be drafted in compliance with a detailed set of
> procedures.  § 1414(d)(1)(B) (internal quotation marks omitted).  These procedures
> emphasize collaboration among parents and educators and require careful
> consideration of the child's individual circumstances.  § 1414.  The IEP is the means
> by which special education and related services are "tailored to the unique needs"
> of a particular child.
>
> The IDEA requires that every IEP include "a statement of the child's present levels
> of academic achievement and functional performance," describe "how the child's
> disability affects the child's involvement and progress in the general education
> curriculum," and set out "measurable annual goals, including academic and
> functional goals," along with a "description of how the child's progress toward
> meeting" those goals will be gauged.  §§ 1414(d)(1)(A)(i)(I)–(III).  The IEP must
> also describe the "special education and related services . . . that will be provided"
> so that the child may "advance appropriately toward attaining the annual goals"
> and, when possible, "be involved in and make progress in the general education
> curriculum."  § 1414(d)(1)(A)(i)(IV).
>
> Parents and educators often agree about what a child's IEP should contain.  But not
> always.  When disagreement arises, parents may turn to dispute resolution
> procedures established by the IDEA.  The parties may resolve their differences
> informally, through a "[p]reliminary meeting," or, somewhat more formally,
> through mediation.  §§ 1415(e), (f)(1)(B)(i).  If these measures fail to produce
> accord, the parties may proceed to what the Act calls a "due process hearing" before
> a state or local educational agency.  §§ 1415(f)(1)(A), (g).  And at the conclusion
> of the administrative process, the losing party may seek redress in state or federal
> court.  § 1415(i)(2)(A).

*Endrew F.*, 137 S. Ct. at 994 (some internal citations omitted).

CPS invokes the IDEA's exhaustion provision in § 1415(l).  Resp. 7, ECF No. 12.  This provision reads:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l).

### B.  R.F.'s Background

R.F. is a ten-year-old girl in the custody and guardianship[2] of the Illinois Department of Children and Family Services ("DCFS").  Huff Aff. ¶ 3.  R.F. has been in DCFS custody at least since she enrolled in CPS in 2018.  *See* Cowling Aff. ¶ 7; Compl. ¶ 41.  Since she first enrolled, R.F. has been placed at the Wilma Rudolph Learning Center ("Wilma Rudolph"), located at 1628 W. Washington Boulevard in Chicago.  *See* Cowling Aff. ¶¶ 2, 5; Compl. ¶ 38.  Wilma Rudolph "is dedicated to the education of students with special needs."  Cowling Aff. ¶ 3; *see also* IEP 3.  Wilma Rudolph is accessible to wheelchair users and has specialized facilities, such as a sensory room and "wiggle room."  *See* Compl. ¶ 46; IEP 3.

R.F. had a foster parent until at least April 2020.  *See* Cowling Aff. ¶ 7; IEP 1; Compl. ¶ 41 (all stating that foster parent participated in IEP meetings).  By December 2021, R.F. had moved her primary residence to Alden Village, an assisted living facility located at 7464 N. Sheridan Road in Chicago.  Huff Aff. ¶¶ 7–8, 10.  Alden Village serves as R.F.'s home address

---

2   Plaintiff Janet Ahern, the guardianship administrator of DCFS, serves as R.F.'s legal guardian.  Aff. of H. Huff ¶ 4, ECF No. 10-3.  In December 2021, the ISBE appointed plaintiff Caren Holderman as R.F.'s educational surrogate parent.  Huff Aff. ¶¶ 10–11; *see also* 20 U.S.C. § 1415(b)(2)(A) (IDEA provision requiring appointment of an educational surrogate parent for, among others, a ward of the state).

for purposes of her transportation to and from school. *See id.* ¶ 7. R.F. does not presently have a foster parent because she resides at an assisted living facility. *Id.* ¶ 9. The reasons for R.F.'s transition to Alden Village do not appear in the record.

In an affidavit filed in support of the pending motion, R.F.'s DCFS case manager, Hanna Huff, avers, R.F. "is medically complex, quadriplegic, and uses a wheelchair." Huff. Aff. ¶ 5; *accord* Compl. ¶ 39. R.F.'s IEP dated April 17, 2020, includes a partial history and a description of the services and accommodations she received at that time. The court has no information on what, if anything, has changed. Neither side argues that R.F.'s disabilities and medical needs have changed insofar as they relate to her transportation to and from Wilma Rudolph.

As described in the April 2020 IEP, R.F. has "Multiple Disabilities, Other Health Impairments, Developmental Delays, Orthopedic Impairment, Speech or Language Impairment." IEP 1. Her medical history includes "Cerebral Palsy, Developmental Delay, Failure to thrive, Microcephalus, Obstructive Sleep Apnea, Bilateral hip contractures, Seizure disorder and Strabismic Amblyopia." *Id.* at 4. R.F. does not talk, and she uses diapers. *Id.* at 3. Her estimated developmental age is 2.8 months. *Id.* at 2. She is at risk of seizures, although she did not experience a seizure in school during the 2019–20 school year. *See id.* at 4. R.F. requires total adult assistance for mobility, including moving her wheelchair and changing position. *Id.* at 3.

The 2020 IEP states that R.F. showed progress in using a supine stander, which allowed her to interact with peers, for 45–60 minutes at a time. *See* IEP 3. She also made slow but steady progress using switches "to activate cause/effect items." *Id.* at 3. R.F. communicates her needs through crying and other vocalizations. *Id.* at 2. R.F. is "interested in physical contact and

social interaction," and enjoys hugging family members. *Id.* at 3. R.F. likes to be picked up, dancing while holding someone's hand, and moving to music. Compl. ¶ 46 (referring to statements in 2019 IEP). Music and musical toys that light up and sing make her smile, and she enjoys watching Sponge Bob. *See* IEP 3.

### C. Educational History and the April 2020 IEP

CPS first determined that R.F. qualified for special education services and adopted an IEP for her on April 13, 2018. Compl. ¶ 41. R.F.'s April 2018 and April 2019 IEPs required CPS to provide her with transportation to and from Wilma Rudolph on an air-conditioned bus with a shared nurse and a wheelchair lift.[3] *See* Compl. ¶¶ 43, 47.

According to the complaint, "On or around January 2020, Defendants were not providing a nurse on transportation for R.F. Due to R.F.'s medical complexity and out of fear for her safety, R.F.'s then foster parent transported R.F. to and from school at Wilma Rudolph Learning Center." Compl. ¶ 48. R.F.'s attorney, who is affiliated with a public interest law firm, filed a complaint about the failure to provide shared nursing with the Illinois State Board of Education (ISBE). Compl. ¶ 49. By January 30, 2020, CPS had permanently assigned a shared nurse to R.F.'s bus route. *See* Compl. ¶¶ 50–51 (nurse was temporarily assigned on Jan. 24, 2020).

R.F.'s IEP was last revised in April 2020, approximately one month after in-person schooling was temporarily halted due to the COVID-19 pandemic. *See* Cowling Aff. ¶ 7; Compl. ¶ 52 (schools temporarily closed beginning Mar. 17, 2020). CPS records show that through March 15, 2020, R.F. had been absent for 51.5 school days of the 2019-20 school year. Cowling Aff. ¶ 6. The revised IEP noted the absences and stated that it had "been completed

---

3   Copies of the 2018 and 2019 IEPs are not in the record. The district does not challenge the
    complaint's representations concerning their contents.

6

with limited data" as a result. IEP 2; Cowling Aff. ¶ 8. R.F.'s absences have not been explained, but the parties do not argue that the absence of data referred to in the IEP affected the decision on what transportation services should be included in the IEP.

The April 2020 IEP provided:

**15. Transportation**

. . . .

R is eligible for transportation as a related service.

Rationale:

- R is eligible for transportation as a related service while attending the assigned school to receive FAPE in the required program.

- R uses a wheelchair to ambulate.

- R presents with documented disabilities: Multiple Disabilities, Other Health Impairment, Developmental Delay, and Orthopedic Impairment.

- R has a documented deficit in assessing risk or advocating for personal safety.

- R lacks the ability to safely navigate an established route from home to school.

- R lacks the ability to travel to school without getting lost or avoiding dangerous traffic situations.

    R presents with Multiple disabilities. She presents with severe global developmental delays.

    A shared nurse is required for the following reasons:

    Student has a history of seizure and may require emergency medication administration.

The student will also require a vehicle with specialized equipment such as:

- air conditioned bus

- wheelchair lift

An aide is required for the following reasons:

R presents with several disabilities including: Multiple Disabilities, Other Health Impairment, Developmental Delay, Orthopedic Impairment, and Speech or Language Impairment. She requires intensive supports in all areas of developmental [sic] including academics and functional life skills.

**Transportation services will be provided by CPS.**

IEP 31 (boldface in original).

### D. Genesis of the Dispute Over R.F.'s Transportation

Classes at Wilma Rudolph resumed in January 2021, though it is unclear whether the classes were fully or partially in-person. *See* Cowling Aff. ¶ 9. Plaintiffs allege that R.F. was effectively excluded from participation in learning during the 2020–21 school year due to her disabilities, inability to participate in remote learning, and her inability to be vaccinated at the time. Compl. ¶ 56. R.F. received her second vaccination against the virus that causes COVID-19 in February 2022. *See* Defs.' Ex. 9 at 3, ECF No. 12-9 (email from Huff dated Feb. 2, 2022). R.F.'s representatives inquired about re-enrolling R.F. Cowling Aff. ¶ 10. They stated on September 2, 2021, that they were exploring another placement for R.F. Cowling Aff. ¶ 10; *see also* Compl. ¶ 58.

On January 13, 2022, R.F.'s attorney, Jaclyn Ellwein ("Ellwein"), inquired about re-enrolling R.F. at Wilma Rudolph or a substantially similar day school. Pls.' Ex. E at 1, ECF No. 10-6. CPS responded on January 25, 2022, that R.F. remained registered at Wilma Rudolph and that her medical and demographic information would need to be updated before a transportation route could be assigned. *See id.* at 2. The record contains several email messages exchanged in January–March 2022 concerning the completion, submission, and routing of the pertinent forms. *See id.* at 3–7; Defs.' Ex. 5 at 1–5, ECF No. 12-5; Defs.' Ex. 9 at 2–3.

Following the completion of all but one set of forms on March 9, 2022, CPS assigned R.F. to a northside bus route on which other Wilma Rudolph students ride. *See* Cowling Aff.

¶ 18; Pls.' Ex. E at 5.  Wilma Rudolph's school day lasts from 7:45 a.m. to 2:45 p.m.  Aff. of

T. Fitzgibbons ¶ 9, ECF No. 12-2.  R.F. has been assigned a pickup time of 5:35 a.m. and a drop-

off time of approximately 4:45 p.m., making her estimated travel time approximately two hours

each way.  Email from McNulty dated Mar. 28, 2022, Pls.' Ex. E at 9–10.  Cowling advised

R.F.'s guardians at Alden Village that this was "the only pick up time available for this

residence."  Cowling Aff. ¶ 19.  CPS has filed an affidavit of a senior transportation router,

Timothy Fitzgibbons, averring that one of its vendors "currently services the only available route

from Wilma Rudolph Elementary School to the [sic] R.F.'s pickup location . . . .  Additionally,

this is the only available bus route with a wheelchair accessible bus."  Fitzgibbons Aff. ¶¶ 11–12.

On March 17, 2022, CPS confirmed receipt of the final set of forms needed to enroll R.F.

Defs.' Ex. 5 at 4; *see also* Cowling Aff. ¶ 21.  Ellwein, R.F.'s attorney, wrote to ask whether R.F.

could start school the next day and added, "We need to hold an IEP meeting as soon as possible,

as [R.F.] is overdue for her annual."  Defs.' Ex. 5 at 4.  A CPS nursing staff member replied, "I

am now able to request a nurse on the bus for the student.  Once a nurse has been assigned,

[Alden] Village will be notified."  Defs.' Ex. 5 at 4.  Sometime later, one of R.F.'s representatives

apparently[4] inquired about progress assigning a nurse, and Cowling replied on March 23, 2022,

that he was awaiting an answer and that R.F. could begin school immediately if someone could

drop her off at school.  Pls.' Ex. E at 8.

CPS's representative, Maura McNulty ("McNulty"), sent an email message on March 28,

2022, stating that CPS nursing staff had concerns about a two-hour travel time posing an

unacceptable risk to R.F.'s health.  *See* Pls.' Ex. E at 9–10.  The affidavit of Tashunda Green-

---

4   The text of the email Cowling responded to has been redacted in the record, for reasons unknown to
    the court.  *See* Pls.' Ex. E at 8.

Shelton, a licensed professional nurse and deputy chief health officer for CPS, explains her

concerns.  Her affidavit does not vary materially[5] from the email dated March 28, 2022:

> After reviewing the medical file and conferring with the District Representative, I concluded that the proposed commute of almost 2 hours each way to and from R.F.'s home and the Rudolph Learning Center posed health risks for the student. More specifically, I noted that R.F. is incontinent, wheel chair bound and non-verbal.  Diaper changes cannot be conducted during transit due to privacy issues and other concerns.  In the absence of a diaper change, the student will potentially have to sit in urine and/or feces for an extended period of time.  This could cause skin irritation, infections and sepsis.  In addition, a long commute can trigger epileptic seizures.

Green-Shelton Aff. ¶ 9, ECF No. 12-4.

Ellwein responded on March 31, 2022: "We are in agreement with the district that a

2 hour ride time each way would not provide the student with FAPE.  The District is in charge of

transportation and must legally provide it."  Defs.' Ex. 5 at 2.  The district, she added, "needs to

either find another route that doesn't require a 2 hour ride time each way or provide different

transportation" and characterized CPS's failure to provide another transportation option as a

"continued denial of FAPE which we will be seeking comp ed for."  *Id.*  McNulty, the district's

representative, responded that they were not denying a FAPE but were instead:

> trying to create a plan that takes all of [R.F.'s] needs into careful consideration.  At this time, the transportation department cannot offer any other option other than the route that has been provided.

> Therefore, we want to enroll [R.F.] at Rudolph immediately and establish homebound services for her.  Additionally, as you know, her IEP is out of compliance.  Upon enrollment, we will be able to begin the process of bringing her documents current.

Pls.' Ex. E at 11 (email from M. McNulty dated Apr. 1, 2022).

---

5   The March 28, 2022, message also expressed COVID-related concerns.  *See* Pls.' Ex. E at 9. McNulty's email message dated April 1, 2022, clarified that nursing staff were requesting information regarding Alden Village's COVID protocols.  *Id*. at 11.  This issue no longer appears to be relevant.

The homebound program is:

> an academic program in which the student receives educational and related services in the home or hospital. It is intended for students whose disability makes it impossible for them to attend school with their peers, such as students who are currently hospitalized and unable to leave the hospital to attend school. Homebound is one of the most restrictive settings for a student and deprives them of all access to peers.

Compl. ¶ 77. Eligibility for homebound instruction requires submission of a physician's statement specifying the student's medical condition, its impact on the student's ability to participate in an education, and the expected duration of the student's impairment. *See* Ill. Admin. Code tit. 23, § 226.300(b) (West 2022). No such statement has been submitted.

R.F.'s and CPS's representatives met on April 28, 2022. Cowling Aff. ¶ 28. Plaintiffs, through counsel, rejected homebound services on the ground that R.F. did not have a medical need for them. *Id.*

### D. Evidence Concerning Nurses and Bus Drivers

CPS argues, "As a direct result of the pandemic, CPS faces severe shortages of both bus drivers and nurses." Resp. 2, ECF No. 12. Regarding nursing, Green-Shelton avers that CPS maintains a waiting list of students who require nursing services during transit as part of an IEP but have not yet received those services due to the nursing shortage. ECF No. 12-4 ¶ 7. How long this list is and whether R.F. is on it are not stated. *See id.* Per Green-Shelton's affidavit, "The global COVID-19 pandemic has caused an extraordinary demand for nursing services, to the point where there is a nursing shortage in the City of Chicago. Every week, I receive multiple resignations from nurses who have been offered upwards of $200/hour from hospitals who treat COVID patients." [6] *Id.* ¶ 6. To address the shortage, CPS has posted nursing jobs on

---

6   CPS has six nursing vendors and primarily uses three of them. Green-Shelton Aff. ¶ 5. Green-Shelton avers that three vendors recently did not renew their vendor relationship with CPS, but the

its website, participated in job fairs, and partnered with universities to train student nurses.  *Id.*

¶ 8.  According to Green-Shelton's affidavit, "it is very difficult" to find a nurse willing to board

the bus prior to R.F.'s pick up time of 5:30 a.m. and finish working after 5:00 p.m.,

approximately 15 minutes after R.F. would be dropped at Alden Village.  *Id.* ¶ 10.  Green-Shelton

does not opine on how difficult it would be to hire a nurse to accompany R.F. on a shorter

commute.  *See id.*

Regarding bus drivers, Fitzgibbons avers that CPS is experiencing a bus driver shortage,

that there is a shortage of wheelchair-accessible buses in Chicago (it is unclear whether this

refers to CPS buses or buses more generally), and that "there are 218 Wheelchair Yellow buses to

service all of CPS."  ECF No. 12-2 ¶¶ 3, 5, 6.  Fitzgibbons further avers,

> Part of the shortage [of bus drivers] is because state law requires bus drivers to be
> vaccinated for COVID-19 or undergo weekly testing if they are unvaccinated.
> Additionally, there has been a decrease in the number of bus drivers as a result of
> the City of Chicago extending the school day by approximately 90 minutes.

Fitzgibbons Aff. ¶ 3.

The record also contains a CPS board resolution dated December 15, 2021, regarding

transportation, and a power point presentation dated January 26, 2022, entitled "Transportation

Update."  Defs' Ex. 7, ECF No. 12-7; Defs.' Ex. 6, ECF No. 12-6.  According to the resolution,

CPS provides transportation to students with an IEP, students in temporary housing situations,

low-income general education students, and general education students who are enrolled in a

magnet school.  *See* Defs.' Ex. 7 at 2–3.  General education students account for 44% of the

students CPS transports to and from school.  Defs.' Ex. 6 at 5.

---

reasons for the non-renewals are not stated, and how, if at all, the non-renewals relate to the COVID-19 pandemic or any other aspect of the nursing shortage has not been explained.  *See id.*

The transportation update dated January 26, 2022, also states that, due in part to the national shortage of bus drivers (exacerbated by the pandemic), 715 diverse learners (referring to disabled students entitled to transportation by an IEP) were without transportation services as of January 17, 2022. *Id.* at 3. The transportation update also shows that CPS made strides in this area: The number of diverse learners without transportation had decreased each month since peaking at over 2,300 in September 2021. *See id.* (chart of diverse learners without transportation service, Sept. 2021 to Jan. 2022). The resolution dated December 15, 2021, also outlines the district's plan for hiring 150 additional bus drivers and addressing students' transportation needs, including contracting with six additional transportation vendors, providing incentives for recruiting new drivers, and hosting job fairs. *See* Defs.' Ex. 7 at 2. A chart in the transportation update breaks down, week-by-week, the estimated number of bus drivers CPS intended to hire and the number of diverse learners who will receive transportation as a result. *See* Defs.' Ex. 6 at 8. According to the transportation update, all of the 715 diverse learners were anticipated to have transportation by the week of February 28, 2022, if the estimated hires were made. *See id.* The record does not disclose whether the estimated bus driver hires were in fact made or what the current transportation situation is at CPS.

## II. Standard for Issuing a Temporary Restraining Order

"The essence of a temporary restraining order is its brevity, its ex parte character and . . . its informality." *Geneva Assurance Syndicate, Inc. v. Med. Emergency Servs. Assocs. S.C.*, 964 F.2d 599, 600 (7th Cir. 1992) (per curiam). Courts in the Seventh Circuit employ the same four-factor balancing test when considering a TRO motion and a motion for a preliminary injunction. *E.g.*, *Troogstad v. City of Chicago*, ___ F. Supp. 3d ___, 2021 WL 5505542, at *2 (N.D. Ill. Nov. 24, 2021).

To obtain a TRO, plaintiffs must make a threshold showing that (1) R.F. "will suffer irreparable harm in the absence of an injunction," (2) "traditional legal remedies are inadequate to remedy the harm," and (3) "some likelihood of success on the merits." *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 24 F.4th 640, 644 (7th Cir. 2022). If this threshold showing is made, "the court must then balance the harm the moving parties would suffer if an injunction is denied against the harm the opposing parties would suffer if one is granted, and the court must consider the public interest, which takes into account the effects of a decision on non-parties." *Id*. (citing *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018)).

### III. Analysis

Like the parties, the court begins with plaintiffs' likelihood of success on the merits. But first the court must settle an overarching dispute concerning what relief plaintiffs are seeking. CPS argues plaintiffs seek a dedicated bus and nurse. Resp. 2, 4, 14, 15, 19. Plaintiffs have not asked the court to order CPS to assign a dedicated bus or nurse to R.F., however. They frame their claims as a request to "enforce" the April 2020 IEP. *E.g.*, Compl. ¶¶ 28, 95, 111. In plaintiffs' proposed form of temporary restraining order submitted to the court (with a copy to opposing counsel), plaintiffs ask the court to order CPS to provide R.F. with a commute time that does not exceed 60 minutes. Proposed TRO 2. The proposed order does not specify how that goal is to be accomplished, leaving it up to the district to comply. *See id.*

### A. Plaintiffs Have Shown Some Likelihood of Success on the Merits Because They Seek Relief Not Available Under the IDEA

The district argues that all of plaintiffs' claims are subject to exhaustion under the IDEA and *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017). *See* Resp. 6–10. "Ordinarily, a plaintiff may not file an IDEA lawsuit without first exhausting available administrative remedies. However, exhaustion may be excused if administrative review would be futile or inadequate."

14

*Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 494 (7th Cir. 2012) (citations omitted). Failure to exhaust administrative remedies is an affirmative defense. *Mosely v. Bd. of Educ. of City of Chi.*, 434 F.3d 527, 533 (7th Cir. 2006) (citation omitted).

The first question under *Fry* is whether plaintiffs' claims fall within the scope of IDEA's exhaustion provision, 20 U.S.C. § 1415(l). The Court in *Fry* provided guidance on applying § 1415(l) in the context of ADA and Rehabilitation Act claims brought by the parents of a kindergartener with cerebral palsy. *See* 580 U.S. at 748–59. The student's IEP afforded her one-on-one assistance throughout the school day. *Id.* at 751. At her pediatrician's recommendation, the student's parents obtained a trained service dog to assist her. *Id.* But the school refused her parents' request to allow her to bring the service dog to school, citing the IEP and the one-on-one assistance she received. To determine whether the IDEA exhaustion requirement applies, *Fry* instructs courts to look to "the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Id.* at 755. The "substance, not surface" of plaintiffs' claims guides the inquiry. *Id.* (eschewing a "magic words" approach). "The inquiry, for example, does not ride on whether a complaint includes (or, alternatively, omits) the precise words 'FAPE' or 'IEP.' " *Id.* Rather, the "court should attend to the diverse means and ends of the statutes covering persons with disabilities—the IDEA on the one hand, the ADA and Rehabilitation Act (most notably) on the other." [7] *Id.* at 755.

How to apply *Fry* to the claims here is far from clear. The plaintiffs here seek to enforce an IEP rather than reasonable accommodation on a matter not directly addressed in the IEP. *E.g.,*

---

7   To discern whether the gravamen of a given claim is the denial of a FAPE, two hypothetical questions are suggested in the *Fry* opinion: (1) "could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school?" and (2) could an "*adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" 580 U.S. at 756 (italics in original).

Compl. ¶ 95; Reply 11, ECF No. 16.  Accordingly, the court takes a step back to the fundamental

reasons for *Fry*'s holding.

The *Fry* Court adopted the gravamen test after delving into IDEA's statutory and

regulatory scheme and concluding that "relief for the denial of a FAPE . . . is the only 'relief' the

IDEA makes 'available' " and therefore the only relief an administrative hearing officer may

properly grant.  *See* 580 U.S. at 752–53.  The Seventh Circuit has similarly held that claims for

relief not available under the IDEA need not be exhausted.  *See McCormick v. Waukegan Sch.*

*Dist. No. 60*, 374 F.3d 564, 567–68 (7th Cir. 2004) (claims for money damages need not be

exhausted because IDEA does not make money damages available); *Charlie F.*, 98 F.3d at 991

(same as to principle that exhaustion is not required for claims for money damages).  So the

question becomes whether the IDEA makes a remedy available to enforce the terms of R.F.'s

April 2020 IEP.

Plaintiffs argue that the IDEA makes no such remedy available.  They cite the Illinois

Administrative Code[8] and *Hollenbeck v. Board of Education of Rochelle Township,* 699 F. Supp.

658, 661 (N.D. Ill. 1988), in which the court excused the parents of a disabled student from

further exhausting their administrative remedies because "there really is no administrative

mechanism to enforce compliance with a hearing officer's order."  699 F. Supp. at 661 (citations

---

8    The provision of the Illinois Administrative Code plaintiffs cite includes a non-exhaustive list of a
     hearing officer's powers: "The hearing officer shall conduct the hearing and, with respect to the
     hearing, shall have, *but is not limited to*, the following powers . . . ."  Ill. Admin. Code tit. 23,
     § 226.660 (West 2022) (emphasis added).  Among the enumerated powers, a hearing officer may
     "render decisions and issue orders and clarifications."  *Id.* § 226.660(h).  The district cites Ill. Admin.
     Code tit. 23, § 226.675, which empowers the ISBE to monitor compliance with hearing officers'
     orders and withhold state or federal funds from a district upon a finding of non-compliance.  Resp. 11.
     As explained in the text and in *Fry*, what matters for purposes of the exhaustion analysis is that the
     IDEA makes no remedy available, regardless of the ISBE's oversight role.  *See Porter ex rel. Porter v.*
     *Bd. of Trs. of Manhattan Beach Unified Sch. Dist.*, 307 F.3d 1064, 1069–70 (9th Cir. 2002).

16

omitted).  The Second and Ninth Circuits have similarly held in cases where a school district allegedly refused to comply with a hearing officer's order that exhaustion would be futile because a higher-level state hearing officer lacked jurisdiction to enforce the order.  *See Porter*, 307 F.3d at 1069–70; *Mrs. W. v. Tirozzi*, 832 F.2d 748, 756 (2d Cir. 1987).  And at least three judges in this district have concluded that a remedy under 42 U.S.C. § 1983 (plaintiffs' count II here) is available to enforce a hearing officer's order because the IDEA provides no enforcement mechanism for such orders.  *See H.P. v. Bd. of Educ. of City of Chi.*, 385 F. Supp. 3d 623, 636 (N.D. Ill. 2019) (citing *Robinson v. Pinderhughes*, 810 F.2d 1270, 1272–75 (4th Cir. 1987); *A.T. v. N.Y. State Educ. Dep't*, 1998 WL 765371, at *6–7 (E.D.N.Y. Aug. 4, 1998)); *Dominique L. v. Bd. of Educ. of the City of Chi.*, 2011 WL 760019, at *3 (N.D. Ill. Feb. 25, 2011); *Reid v. Bd. of Educ., Lincolnshire-Prairie View Sch. Dist. 103*, 765 F. Supp. 965, 969 (N.D. Ill. 1991).

These cases rest on the text of the IDEA.  The IDEA allows "[a]ny party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party *aggrieved by the findings and decision* made under this subsection" to sue to obtain judicial review.  20 U.S.C. § 1415(i)(2)(A) (emphasis added).  Relying on the emphasized language, courts have reasoned that a plaintiff cannot sue under the IDEA to compel a school district to comply with a favorable hearing officer's decision because the plaintiff is aggrieved by the district's noncompliance rather than the hearing officer's order.  *See* cases cited in the previous paragraph.  Consider what would happen if plaintiffs obtained a favorable decision from a hearing officer enforcing the April 2020 IEP.  The IDEA would afford plaintiffs no remedy if the district refused to comply with that order, forcing plaintiffs to file a § 1983 action.  *See, e.g.*, *H.P.*, 385 F. Supp. 3d at 636.  Because IDEA exhaustion is required "only when [the plaintiff's] suit 'seeks relief that is also available' under the IDEA," exhaustion

does not appear to be required on plaintiffs' claims to enforce the April 2020 IEP. *Fry*, 580 U.S. at 752 (internal parenthesis and brackets omitted). Judge Dow's decision in *Channell v. Chicago Board of Education*, 2021 WL 5113876 (N.D. Ill. Nov. 3, 2021), is therefore distinguishable because, unlike the April 2020 IEP here, to which the district agreed and to which it is bound, there was no legally enforceable IEP or agreement for the court to enforce in *Channell*. *See id.* at *5 ("Plaintiff has not identified any obligation on the part of CPS to honor Plaintiff's request, either by law or agreement.").

This does not mean these plaintiffs, or others, may bypass the process for updating an IEP and seeking administrative and judicial review.[9] *See* Cowling Aff. ¶ 28. The court knows very little about the meeting held April 28, 2022, but questions have been raised about whether R.F.'s placement at Wilma Rudolph should be changed to homebound instruction. *See id.* Yet, as far as appears in this record, CPS has not initiated the process required by the IDEA to change R.F.'s

---

[9] CPS also argues that this court should abstain from hearing this dispute and defer to the administrative process for resolving IDEA disputes. Resp. 10–12. The district cites no case abstaining from hearing an IDEA-related dispute. *See id.* In *J.B. v. Woodard*, 997 F.3d 714, 723–25 (7th Cir. 2021), the Seventh Circuit held that the court should have abstained to avoid interfering with ongoing family law proceedings in state court. The district's second case, *SKS & Assocs. v. Dart*, 619 F.3d 674, 679 (7th Cir. 2010) is an abstention case involving landlord-tenant proceedings. The third case CPS cites involved not abstention but a decision to remand an IDEA dispute to a hearing officer. *See Navin v. Park Ridge Sch. Dist. No. 64*, 2002 WL 774300, at *5–6 (N.D. Ill. Apr. 29, 2002), *aff'd sub nom. Navin v. Park Ridge Sch. Dist. 64*, 49 F. App'x 69 (7th Cir. 2002). Somewhat idiosyncratic factors drove the remand decision. There had been no administrative proceedings on the merits because the hearing officer incorrectly believed the child's non-custodial parent lacked capacity to participate (this was wrong, *Navin v. Park Ridge School District 64*, 270 F.3d 1147 (7th Cir. 2001)), so the *Navin* court sent the case back to the hearing officer to make an administrative record in the first instance. *See* 2002 WL 774300, at *5–6. The district does not explain what is lacking in the present record that could be better developed in the administrative process, however. *See* Resp. 10–12. More fundamentally, there is no prior administrative proceeding that could be the subject of a remand order. Finally, to the extent CPS raises concerns about federalism and interference with traditional state functions such as domestic relations, no such concerns appear to be present here. The IDEA review process exists not as a traditional state function but as the result of federal legislation initiated under the Spending Clause. *See Endrew F.*, *supra*, 137 S. Ct. at 993. For all of these reasons, the court is not persuaded at the TRO stage that the district's abstention arguments are likely to be a barrier to plaintiffs' success on the merits.

educational placement by sending plaintiffs the written notice required by 20 U.S.C.

§ 1415(b)(3).  *See* Reply 14–15 (representing that no notice has been received); *but see* Cowling

Aff. ¶ 28 (noting meeting was held Apr. 28, 2022, at which homebound placement was

discussed).

Once the district initiates the § 1415 process to change R.F.'s placement (assuming that it

does), her right to remain in her current educational placement—that is, to remain at Wilma

Rudolph with the transportation services guaranteed by the April 2020 IEP–would appear to be

clear.  The IDEA's stay-put provision, 20 U.S.C. § 1415(j), preserves a student's current

educational placement while the § 1415 process plays out through an administrative hearing,

decision, any administrative appeal, and litigation under § 1415 seeking judicial review.  *See,*

*e.g.*, *Ostby v. Manhattan Sch. Dist. No. 114*, 851 F.3d 677, 681 (7th Cir. 2017); *John M. v. Bd. of*

*Educ. of Evanston Twp. High Sch. Dist. 202*, 502 F.3d 708, 713–14 (7th Cir. 2007); *Casey K. ex*

*rel. Norman K. v. St. Anne Cmty. High Sch. Dist. No. 302*, 400 F.3d 508, 510 (7th Cir. 2005).

Although the stay-put provision does not govern the pending motion because no § 1415

proceedings are pending as far as the record shows, Congress's purpose in enacting it

nevertheless remains a relevant consideration.  "In enacting the stay-put provision, Congress

intended 'to strip schools of the *unilateral* authority they had traditionally employed to exclude

disabled students . . . from school.' "  *John M.*, 502 F.3d at 713–14 (quoting *Honig v. Doe*,

484 U.S. 305, 323 (1988)) (emphasis in *Honig*).  This includes existing transportation services

for the student required by her IEP.  *E.g.*, *Aaron M. v. Yomtoob*, 2003 WL 223469, at *5

(N.D. Ill. Feb. 3, 2003).

The district does not say that it wishes to exclude R.F, but she has nevertheless been

completely excluded from the educational placement required by her IEP as the result of the

district's unilateral actions. Thus, issuing injunctive relief furthers Congress's purpose, as reflected in the IDEA's stay-put provision. *See Honig*, 484 U.S. at 323–24. Indeed, and importantly, the Seventh Circuit has recognized that a preliminary injunction may be issued to preserve the status quo and compel a school district to maintain services required by an existing IEP pending administrative review, even where IDEA's stay-put provision does not apply. *See Bd. of Educ. of Oak Park & River Forest High Sch. Dist. 200 v. Ill. State Bd. of Educ.*, 79 F.3d 654, 659–60 (7th Cir. 1996), *amended* (Apr. 23, 1996).

Having found that plaintiffs have shown some likelihood of success on the exhaustion issue, there is essentially no dispute that CPS is not complying with the IEP. It is undisputed that the April 2020 IEP requires CPS to provide R.F. with an air-conditioned bus equipped with a wheelchair lift, a shared nurse, and an aide. IEP 31. It is also undisputed that CPS has not provided any of those things since R.F.'s enrollment paperwork was completed on March 17, 2022. And all parties agree that the sole transportation option the district has offered poses an unacceptable--indeed life-threatening--risk to R.F. *See* Pls.' Ex. E at 9–10 (Mar. 28, 2022, email); Green-Shelton Aff. ¶ 9. CPS notes that the IEP does not specify how long R.F.'s commute to and from school must be, but the court does not understand the district to be arguing that the IEP can be reasonably interpreted as permitting the district to provide a transportation option that its nursing staff have rejected as life-threatening in the context of R.F.'s specific medical needs. *See* Green-Shelton Aff. ¶ 9. CPS does not dispute that plaintiffs' proposal to require no more than a 60-minute commute is a reasonable interpretation of the April 2020 IEP.

For all of these reasons, the court finds that plaintiffs have demonstrated that they have some likelihood of succeeding on the merits and overcoming the district's exhaustion defense.[10]

### B. R.F. Will Likely Suffer Irreparable Injury Absent Injunctive Relief

As far as appears from the record, the parties have reached an impasse. So R.F. will not receive education services absent injunctive relief. A deprivation of meaningful education services to a child who depends on them constitutes an irreparable injury, as does her continued de facto segregation from other students. *See Skelly v. Brookfield LaGrange Park Sch. Dist. 95*, 968 F. Supp. 385, 395–96 (N.D. Ill. 1997); *Carl B. v. Mundelein High Sch. Dist. 120 Bd. of Educ.*, 1993 WL 787899, at *3 (N.D. Ill. Sept. 3, 1993); *Doe v. Dolton Elementary Sch. Dist. No. 148*, 694 F. Supp. 440, 446–48 (N.D. Ill. 1988). CPS does not suggest that money damages or compensation education time would be an adequate remedy. *See* Resp. 17–18. As the court in *Skelly* put it, absent an injunction giving her transportation to and from school, R.F. will "suffer irreparably from the lack of educational and social interaction which, but for the absence of the bus ride, is available to" her. 968 F. Supp. at 396.

The district points out that R.F.'s guardians effectively withdrew her from school in February 2020. CPS argues, "Plainly, some kind of care plan has been in place for the past two years, and continuation of that plan until the parties identify feasible educational options for R.F. would not cause irreparable injury." Resp. 18. In the first place, the available evidence and allegations demonstrate that the outbreak of the COVID-19 pandemic played a significant part in

---

10 Defendants also move to dismiss plaintiffs' ADA and Rehabilitation Act claims for failure to state a claim. *See* Resp. 13–16. The court does not reach those arguments today, as they are not the focus of the parties' TRO briefing. Also not reached are plaintiffs' alternative theories that exhaustion is not required because they raise a systemic challenge. *See* Reply 11–13.

R.F.'s non-attendance between February 2020 and February 2022, when she was vaccinated. *See* Defs.' Ex. 9 at 3 (email dated Feb. 2, 2022, concerning vaccines).

The district's argument ultimately conflates a "care plan," which the court takes to mean meeting R.F.'s daily physical needs, with the free appropriate public education to which she is entitled under the IDEA and her April 2020 IEP. The district does not seriously argue, and nothing in the record suggests, that R.F.'s current situation is comparable to the education and other services she will receive if she is furnished transportation to Wilma Rudolph. These issues must be fleshed out more fully at the preliminary injunction stage. For purposes of issuing a TRO, plaintiffs have shown that R.F. faces the threat of an irreparable injury absent injunctive relief.

### C. Plaintiffs Have No Adequate Remedy at Law

The court also finds that R.F. has no adequate remedy at law. In a perfunctory, three-sentence argument, the district cross-references its argument that IDEA exhaustion is required in support of its contention that plaintiffs have an adequate remedy at law. *See* Resp. 17. The district's arguments are rejected for the reasons explained in Part III.A, *supra*.

### D. The Balance of Public and Private Harms Favors Issuing Injunctive Relief

The district and plaintiffs both quote *Massey v. District of Columbia,* 400 F. Supp. 2d 66, 76 (D.D.C. 2005): "The public interest lies in the proper enforcement of the IDEA and in securing the due process rights of special education students and their parents provided by statute." (citation and internal ellipses omitted), *quoted in* Resp. 19. Again reprising its exhaustion arguments, CPS asserts that the public interest lies in requiring exhaustion under the IDEA to avoid forcing every placement dispute into federal court. Resp. 19. But again, this is not a dispute over placement but over enforcing an existing IEP. The stay-put provision of the IDEA evidences a Congressional purpose to preserve the "recognized and defined special needs

of the child and the educational goals originally set by the parents and by professional educators"
in an agreed IEP pending a resolution of a dispute over a child's placement. *John M.*, *supra*,
502 F.3d at 715. As reflected in the IDEA, then, the public interest favors preserving R.F.'s
April 2020 IEP's transportation services unless and until the parties have gone through the
process of updating her IEP. *See id.*; *Oak Park & River Forest*, 79 F.3d at 659–60.

The district also contends that the shortage of buses and nurses presents a "Sophie's
choice" and that other students may be unfairly harmed if plaintiffs receive a TRO. *See*
Resp. 18–19. If the court orders CPS to provide a dedicated driver and vehicle for R.F., then that
"driver and vehicle will be unavailable to run a route that could potentially serve dozens of
special education students." *Id.* at 19. Similarly, CPS posits that awarding R.F. temporary
injunctive relief "could potentially result" in diverting nursing care from another student with
greater medical needs or a group of students with medical needs. *Id.* at 18; *see also* Green-
Shelton Aff. ¶ 11.

As discussed above, plaintiffs do not seek an order requiring CPS to divert resources or
provide R.F. with a dedicated bus route or a dedicated nurse. She seeks to enforce the provisions
of her IEP, to which CPS agreed and which require CPS to provide a bus with a wheelchair lift,
air conditioning, a "shared nurse," and an aide. IEP 31. Green-Shelton, CPS's deputy chief
health officer, avers that nurses are resigning from CPS because hospitals offer them a greater
hourly wage to treat COVID-19 patients. *See* ECF No. 12-4 ¶ 6. CPS therefore presents the
court with a dilemma as to which the court lacks both evidence and expertise sufficient to be
involved: either divert resources from other students or divert funds to provide greater incentives
for nurses and bus drivers so that CPS meets its obligations to comply with R.F.'s and other

students' IEPs. CPS cannot thrust this choice on the court. The Supreme Court has cautioned courts that they

> lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy.' We think Congress shared that view when it passed the Act . . . . Therefore, once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States.

*Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 208 (1982) (citation omitted). The IDEA's regulations do not permit delaying implementation of an IEP due to financial considerations. *See* 34 C.F.R. § 300.103(c) (West 2022) ("[T]he State must ensure that there is no delay in implementing a child's IEP, including any case in which the payment source for providing or paying for special education and related services to the child is being determined.") Thus, it would be highly inappropriate for this court to become entangled in CPS's financial affairs beyond executing the IDEA's directive that financial considerations not delay implementation of a binding IEP. As the *Massey* court concluded, the public (and private) interest in enforcing an agreed IEP "outweighs any asserted financial harm to" the district. *Massey*, 400 F. Supp. 2d at 76 (citing *Petties v. District of Columbia*, 238 F. Supp. 2d 88, 99 (D.D.C. 2002)).

## IV. Conclusion

For the reasons stated, the court finds that plaintiffs have demonstrated some likelihood of success on the merits of their § 1983 claim to enforce R.F.'s IEP and that she will suffer irreparable harm for which she has no adequate remedy at law unless she obtains injunctive relief. The public interest and harms, when balanced, favor enforcement of R.F.'s IEP. This conclusion is strengthened under the sliding scale approach by the fact that, other than the exhaustion issue, the district has all but conceded that it is not in compliance with the April 2020 IEP.

Plaintiffs' motion for a temporary restraining order is granted.[11] A separate temporary restraining order will be issued consistent with this opinion. *See* Fed. R. Civ. P. 65(d)(1).

Dated: June 2, 2022             _____/s/_____

                                         Joan B. Gottschall
                                         United States District Judge

---

11 The record contains evidence that R.F. is indigent. She does not have the financial resources to post a bond. Huff. Aff. ¶ 23. "Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)" requiring the posting of a bond whenever a TRO or preliminary injunction issues. *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (citation omitted). The plaintiff's indigency is such a circumstance. *Id.* (citation omitted); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 955 (W.D. Wis. 2018) (quoting *Wayne Chem.*, 567 F.2d at 702); *Smith v. Bd. of Election Comm'rs for City of Chi.*, 591 F. Supp. 70, 72 (N.D. Ill. 1984) (citation omitted). Considerations relevant to the decision whether to exercise discretion to waive an injunction bond include: "(1) the possible loss to the enjoined party, (2) the hardship a bond would impose on the applicant and (3) the impact of a bond on the enforcement of federal rights." *Smith*, 591 F. Supp. at 72 (numbering added) (citing *Crowley v. Local No. 82*, 679 F.2d 978, 1000 (1st Cir. 1982)).

The district offers no argument in opposition to plaintiffs' request to waive an injunction bond. The court has no evidence from which to estimate the cost to the district if the TRO issues in error. On the other hand, requiring R.F. to post a bond would effectively nullify her ability to enforce her federal rights conferred by her IEP. The court therefore waives the requirement to post an injunction bond.